IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TRACEY BRENDA DAVIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 10-1480 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

## I.   INTRODUCTION

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Tracey Brenda Davis and Defendant Michael J. Astrue, Commissioner of Social Security.  Plaintiff seeks review of final decisions by the Commissioner denying her claims for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.,* and supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.*  For the reasons discussed below, Defendant's motion is granted and Plaintiff's motion is denied.

## II.  BACKGROUND

### A.  Factual Background

Plaintiff Tracey Davis was born on September 28, 1964. (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 6, "Tr.,"" at 147.)  After

graduating from high school in 1983, Ms. Davis worked as a data entry clerk until 2005.  (Tr. 152, 155.)  She later earned a certificate as a nursing assistant in 2003 and worked at a nursing home in Pittsburgh, Pennsylvania. (Tr. 26, 155.)

In June 2006, Ms. Davis reported to her medical providers that although she had been working steadily, she was not making enough money to make financial ends meet.  (Tr. 296.)  She was unable to pay her rent and lost her apartment.  She relapsed into using drugs and alcohol, both of which had been a problem since her youth, and asked to be voluntarily admitted to a dual diagnosis unit at Mercy Behavioral Health Services, seeking treatment for depression, suicidal thoughts, and polysubstance abuse.  (Id.)  Over the next three years, Ms. Davis continued to seek repeated in-patient and community-based treatment for these problems.

B.   Procedural Background

On May 15, 2008, Ms. Davis filed applications for supplemental security income and disability insurance benefits, alleging disability as of September 1, 2005,[1] due to depression, post-traumatic stress disorder ("PTSD"), anxiety, bipolar disorder, paranoia, and suicidal thoughts.  (Tr. 151.)  The Social Security Administration ("SSA") denied both applications on September 8,

---

[1]   At the hearing before the ALJ, Plaintiff modified her alleged onset date of disability to May 15, 2008.  (Tr. 24.)

2008, reasoning that although she had been diagnosed with depression and anxiety and could not perform her past work as a data processing clerk, there were other unskilled jobs she could perform. (Tr. 48-58.)

Plaintiff then timely requested a hearing before an Administrative Law Judge ("ALJ"), which was held on February 23, 2010, before Judge Guy Koster in Pittsburgh, Pennsylvania. Ms. Davis, who was represented by counsel, testified, as did an impartial vocational expert ("VE"), Samuel E. Edelmann, M.Ed. Judge Koster issued his decision on April 22, 2010, again denying benefits. (Tr. 7-20.) On September 16, 2010, the Social Security Appeals Council advised Ms. Davis that it had chosen not to review the ALJ's decision, finding no reason under its rules to do so. (Tr. 1-5.) Therefore, the April 22, 2010 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), citing Sims v. Apfel, 530 U.S. 103, 107 (2000). On November 5, 2010, Plaintiff filed suit in this Court seeking judicial review of the decision.

C.    Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court

3

of the United States for the judicial district in which the plaintiff resides.

## III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake de novo review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), citing Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential,

4

including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.)  If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion.  Panetis v. Barnhart, No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), citing Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000).

**IV.  ANALYSIS**

   A.   The ALJ's Determination

        In determining whether a claimant is eligible for supplemental security income, the burden is on the claimant to show that she has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe she is unable to pursue substantial gainful employment[2] currently existing in the national economy.[3]  The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months.   42 U.S.C. § 1382c(a)(3)(C)(i); Morales v.

---

[2]  According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities."  "Gainful work activity" is the kind of work activity usually done for pay or profit.

[3]  A claimant seeking supplemental security income benefits must also show that her income and financial resources are below a certain level.  42 U.S.C. § 1382(a).

Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000).  To be granted a period
of disability and receive disability insurance benefits, a claimant
must show that she contributed to the insurance program, is under
retirement age, and became disabled prior to the date on which she
was last insured.   42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).   The
Commissioner does not dispute that Ms. Davis satisfied the first two
non-medical requirements and the parties do not object to the ALJ's
finding that Plaintiff's date last insured for purposes of receiving
disability benefits was September 30, 2008. (Tr. 13.)

      To determine a claimant's rights to either SSI or DIB,[4] the ALJ
conducts a formal five-step evaluation:

      (1)   if the claimant is working or doing substantial gainful
            activity, she cannot be considered disabled;

      (2)   if the claimant does not suffer from a severe impairment
            or combination of impairments that significantly limits
            her ability to do basic work activity, she is not disabled;

      (3)   if the claimant does suffer from a severe impairment which
            meets or equals criteria for an impairment listed in 20
            C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings")
            and the condition has lasted or is expected to last
            continually for at least twelve months, the claimant is
            considered disabled;

      (4)   if the claimant retains sufficient residual functional
            capacity ("RFC")[5] to perform her past relevant work, she

---

[4]   The same test is used to determine disability for purposes of receiving
either DIB or SSI benefits.   Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d
Cir. 2002).   Therefore, courts routinely consider case law developed under
both programs.

[5]   Briefly stated, residual functional capacity is the most a claimant can
do despite her recognized limitations.   Social Security Ruling 96-9p

is not disabled; and

(5)  if, taking into account the claimant's RFC, age,
     education, and past work experience, the claimant can
     perform other work that exists in the local, regional or
     national economy, she is not disabled.

20 C.F.R. § 416.920(a)(4); see also Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support her position that she is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[6]  Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Koster first concluded Ms. Davis had not engaged in substantial gainful activity since May 15, 2008, the date on which she applied for benefits and the amended disability onset date.  (Tr. 13.)   In resolving step two, the ALJ found that as of the date of the hearing, Plaintiff suffered from three severe impairments: bilateral osteoarthritis of the knees, depressive disorder (not otherwise specified and substance induced), and polysubstance dependence.  (Id.)

---

defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

[6]  Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage.  Sykes, 228 F.3d at 263, n.2, citing Bowen v. Yuckert, 482 U.S. 137, 146-147, n.5 (1987).

At step three, the ALJ concluded none of Plaintiff's impairments, considered singly or in combination, satisfied the criteria of any relevant Listing.   That is, Plaintiff testified that she had chronic knee pain, but she did not take pain medications and was not under the care of a physician for this problem.   Dr. Larry Dobkin, a consulting physician, indicated on July 31, 2008, that her knee osteoarthritis was "mild" and he did not observe any problems with standing or walking, although she did experience pain in her knees on examination.   (Tr. 18, *citing* Tr. 321-330.)[7]   Using the special technique required in reviewing claims of mental impairments, the ALJ concluded that Plaintiff's depression did not satisfy the relevant Listing, 12.04, Affective Disorders.[8]

> At step four, the ALJ concluded that if Ms. Davis
>
> ceases substance abuse, she will be capable of performing work at the light exertional level.   Further, because of memory and concentration problems, [she] is limited to simple tasks, no production rate pace, requires work with limited contact with supervisors, the public, and co-workers, and cannot be exposed to hazards such as unprotected heights or dangerous machinery.

(Tr. 15.)

---

[7]   The ALJ did not specifically identify the relevant Listing in discussing Plaintiff's alleged osteoarthritis in both knees.   However, Ms. Davis does not raise any arguments regarding this portion of the ALJ's decision and we therefore omit any further discussion of this impairment.

[8]   Again, Plaintiff does not argue that the ALJ's detailed analysis of her depressive disorder did not conform to the step-by-step analysis to be applied in considering mental health impairments.   *See* Listing 12.00A through 12.00I.   Therefore, we omit review and discussion of this analysis.

The ALJ further concluded that Plaintiff could not perform her past relevant work as a data entry clerk which the VE, Mr. Edelmann, had described as semi-skilled and sedentary, or as a nurse's aide, which was described as semi-skilled and heavy.  (Tr. 18-19, *see also* Tr. 43-44.)   However, based on Ms. Davis's age, [9] high school education, work experience, and residual functional capacity, as well as Mr. Edelmann's testimony, the ALJ concluded that assuming she were able to abstain from drugs and alcohol, there were numerous light, unskilled jobs existing in the economy which Plaintiff could perform despite her limitations, for example, motel cleaner, office cleaner, or assembly worker.  (Tr. 19-20, *see also* Tr. 42.)

The ALJ further concluded that Ms. Davis "is unable to maintain any substantial gainful activity as a result of her ongoing substance abuse.   Substance abuse is therefore a material factor in the determination of disability, thus precluding an award of disability benefits."  (Tr. 20.)   He further concluded that but for the effects of substance addiction, Ms. Davis had not been under a disability between May 15, 2008, and the date of his decision and, consequently, was not entitled to benefits.  (Id.)

---

[9]   Ms. Davis was 43 years old on her alleged onset date and 45 at the time of the hearing, making her a "younger person" according to Social Security regulations.   20 C.F.R. § 404.1563(c) and § 416.963(c).

B.   Plaintiff's Arguments

Ms. Davis does not dispute the overall accuracy and completeness of the ALJ's five-step analysis.   Nor does she deny that she has a long history of drug and/or alcohol abuse dating back to her childhood.   (Plaintiff's Brief in Support of Motion for Summary Judgment, Doc. No. 15, "Plf.'s Brief," at 6.)   Rather, she argues that his ultimate decision was erroneous because he did not apply the correct standard in his analysis regarding the effects of her drug addiction or alcoholism ("DAA.")   Plaintiff contends that contrary to Judge Koster's conclusions, her short-lived relapses into drug or alcohol abuse do not distract from the fact that she continued to experience severe mental health symptoms during the entire time period covered by these applications, as evidenced by repeated and frequent assessments of a GAF score[10] of 50 or less.   Her depression and anxiety are evidenced by unreliability in the work environment, difficulty dealing with people, irritability, crying, inability to finish projects, and problems with concentration and memory.   (Id. at 6-7.) Her long history of hospitalizations for mental health treatment and ongoing therapy as an outpatient further

---

[10] The GAF (Global Assessment of Functioning) scale assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves.   Drejka v. Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n.2 (D. Del. Apr. 18, 2002).   See the on-line version of the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("On-line DSM-IV"), Multiaxial Assessment, American Psychiatric Association (2002), at www.lexis.com., last visited November 9, 2011.

reflect her inability to function consistently in a work environment, despite significant medication.  (Id. at 7-16.)

Plaintiff further argues that during "the vast majority of time" between May 15, 2008, and the date of the ALJ's decision, April 22, 2010, she was not abusing any substances.  Thus, because she continued to experience severe mental impairments, the ALJ should have concluded that DAA was not a material factor, entitling her to benefits.  (Plf.'s Brief at 20.)

According to Ms. Davis, the SSA requires only evidence of a 30-day period of sobriety in order to determine if drug abuse and/or alcoholism is a material factor in a claimant's disability.  If the evidence is insufficient to permit the ALJ to delineate between the mental restrictions and limitations imposed by DAA and those caused by other established mental disorders, she is entitled to the benefit of the doubt and should receive benefits.  In this portion of her brief, Plaintiff relies extensively on an emergency message issued by the Social Security Administration on August 30, 1996, stating its policy that where a claimant is disabled but also has a DAA issue, benefits should be awarded unless the ALJ can "separate the mental restrictions and limitations imposed by DAA and the various other mental disorders shown by the evidence."  (Plf.'s Brief at 17-18, citing "Questions and Answers Concerning DAA from the 07/02/06

11

Teleconference," No. EM-96200 (August 30, 1996) ("EM-96200.")[11]  Ms.
Davis argues that relapses such as those she experienced "have
nothing to do with the materiality determination;" any DAA is simply
not material unless the evidence shows that the disability resolves
with sobriety.  (Plf.'s Brief at 17-20.)   The medical evidence shows
that during a number of periods of sobriety lasting 30 days or longer
and two extended periods of four and eight months, her GAF scores
have, with only a single exception, continued to be at 50 or less,
a fact which was ignored by the ALJ.  While she agrees that such
scores, by themselves do not establish disability, numerous courts
have held that they are clearly relevant evidence that an ALJ may
not overlook or misrepresent.  (Id. at 20-23.)   In short, the ALJ
ignored significant evidence and failed to identify any other
evidence in the record that establishes her improvement during
periods of sobriety.  Consequently, his decision should be reversed
and she should be awarded benefits.  (Id. at 24-27.)

    C.   Applicable Law

        In 1996, Congress amended the Social Security Act to
preclude award of either supplemental security income or disability
benefits if drug addiction or alcoholism would be "a contributing
factor material to the Commissioner's determination that the
individual is disabled."  42  U.S.C.  §§  423(d)(2)(C)  and

---

[11] The full text of EM-96200 is available by going to https://
secure.ssa.gov/apps10 and following the "emergency messages" links.

1382c(a)(3)(J); see also Social Security regulations at 20 C.F.R. §§ 404.1535 and 416.935.

In determining if DAA is "a contributing factor material to the determination of disability," the key question is whether the claimant would still be considered disabled if she stopped using drugs and/or alcohol.  In cases where there is evidence of drug addiction or alcoholism, the ALJ first performs the normal five-step analysis to determine if the claimant is disabled.  20 C.F.R. § 416.935(a).  Assuming he concludes that she is disabled (including any impairment attributable to DAA), he then performs a second analysis to determine the effects of drug or alcohol abuse.  The ALJ first identifies those physical and mental limitations which would remain if the claimant stopped using drugs or alcohol.  He then determines if the remaining limitations (individually or in combination) would be disabling.  If the remaining limitations would not be disabling, the conclusion is that DAA is a material factor. Id., § 416.935(b)(2).  In short, "[w]hen an applicant for disability benefits both has a potentially disabling illness and is a substance abuser, the issue for the administrative law judge is whether, were the applicant not a substance abuser, she would still be disabled." Kangail v. Barnhart, 454 F.3d 627, 628-629 (7th Cir. 2006).

The regulations do not explain exactly how the ALJ is to go about separating the limitations attributed to DAA from those due to other

mental impairments. However, in EM-96200, the emergency teletype relied upon by Ms. Davis, the SAA presented guidelines in the form of a series of questions and answers about how to address the DAA issue. In those guidelines, the Administration indicated that the most useful evidence to be considered in the materiality analysis is evidence from a "period when the individual was not using drugs/alcohol." EM-96200 at Answer 29. In this stage of the analysis, the ALJ should consider "the length of the period of abstinence, how recently it occurred, and whether there may have been any increase in the limitations and restrictions imposed by the other mental impairments since the last period of abstinence." See Fahy v. Astrue, CA No. 06-366, 2008 U.S. Dist. LEXIS 48773, *9-*13 (E.D. Pa. June 26, 2008), and Crawford v. Astrue, CA No. 08-1160, 2009 U.S. Dist. LEXIS 32446, *14-*21 (E.D. Pa. April 16, 2009), applying these criteria. The materiality conclusion "must be based on medical evidence, and not simply on pure speculation about the effects that drug and alcohol abuse have on a claimant's ability to work." Ambrosini v. Astrue, 727 F. Supp.2d 414, 430 (W.D. Pa. 2010).

Before turning our attention to the facts of this case, we consider an issue raised by Ms. Davis in the brief in support of her motion for summary judgment, that is, who has the burden of proof in the materiality analysis. (See Plf.'s Brief at 6, stating that in this portion of the analysis, "the burden of proof [is] on the

14

ALJ.")[12]   To date, the United States Court of Appeals for the Third
Circuit has not directly resolved the question of whether the SAA
or the claimant has the burden of proof in establishing that DAA is
or is not a material factor contributing to disability.   *See* McGill
v. Comm'r of Soc. Sec., No. 07-2862, 2008 U.S. App. LEXIS 16270, *5-*6
(3d Cir. July 30, 2008), acknowledging this question but declining
to resolve it.   The Fifth, Eighth, Ninth, and Eleventh Circuits have
concluded that the claimant bears the burden of proving her DAA is
non-material.   *See* Brown v. Apfel, 192 F.3d 492, 498-499 (5th Cir.
1999) (noting that "pragmatically," the plaintiff is the party best
able to show that she would still be disabled in the absence of DAA
and confessing itself "at a loss to discern how the Commissioner is
supposed to make such a showing"); Pettit v. Apfel, 218 F.3d 901,
903 (8th Cir. 2000); Parra v. Astrue, 481 F.3d 742, 748 (9th Cir. 2007)
(assigning this burden to the plaintiff "is consistent with the
general rule that at all times, the burden is on the claimant to
establish his entitlement to disability insurance benefits")
(internal quotation omitted); and Doughty v. Apfel, 245 F.3d 1274,
1280 (11th Cir. 2001).   Within the Third Circuit, district courts have

---

[12]   Plaintiff does not cite case law for this proposition in her brief,
relying instead on a decision of the Social Security Appeals Council dated
December 3, 1989, which purportedly "acknowledges that [placing the burden
on the ALJ or the Administration] is the Agency's policy."   (Plf.'s Brief
at 18 and note 91.)   She indicates the Appeals Council decision is attached
to her brief as Exhibit A; however, it is not, and the Court has been unable
to independently identify and verify the content of such a decision.

generally held that the burden is on the plaintiff. *See*, e.g., Westcott v. Astrue, CA No. 10-78, 2010 U.S. Dist. LEXIS 136020, *37 (W.D. Pa. Dec. 23, 2010) (Conti, J.), concluding that the Court of Appeals for the Third Circuit would follow the rationales of Parra, Doughty, Brown and Mittelstedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000); Ambrosini, 727 F. Supp.2d at 430 (Schwab, J.); Lawrence v. Astrue, CA No. 08-265J, 2010 U.S. Dist. LEXIS 12931, *21 (W.D. Pa. Feb. 16, 2010) (Gibson, J.); Kratch v. Comm'r Soc. Sec., CA No. 09-6010, 2010 U.S. Dist. LEXIS 127079, *15-*16 (D. N.J. 2010); and Thomas v. Astrue, CA No. 08-632, 2008 U.S. Dist. LEXIS 81815, *6 (E.D. Pa. Oct. 15, 2008).

Even if we were to assume that the burden of proof is on the ALJ, the standard of proof is the same as in other parts of the disability analysis.    That is, in arriving at his ultimate conclusion on the materiality issue, the ALJ must identify "substantial evidence" to support his conclusions. Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003) ("Even though the task is difficult, the ALJ must develop a full and fair record and support his conclusion with substantial evidence on this point just as he would on any other.")

D.    The Relevant Medical Evidence

Taken chronologically, the first medical evidence in the record are the notes associated with Plaintiff's inpatient treatment

at the Mercy Hospital Behavioral Health unit ("Mercy Hospital") between June 2 and June 10, 2006.  Ms. Davis voluntarily sought treatment for increased depression with thoughts of wanting to die and polysubstance addiction involving crack cocaine, alcohol, heroin and marijuana.  She stated she was "depressed over her drug use and the fact that she was recently placed [sic] from her apartment and is currently staying in a shelter."  (Tr. 294.)  She was not taking any medication for her mental conditions and apparently had not been for the last eight or nine years.  Her diagnosis on admission was substance induced mood disorder and polysubstance abuse.  (Tr. 294-295.)  Ms. Davis was admitted to the dual diagnosis unit for depression, addiction, and suicidality and placed on an alcohol withdrawal protocol.  Her GAF on admission was 20 and 50 at the time of discharge.[13]  (Tr. 293-313.)

Ms. Davis voluntarily returned to the hospital less than two weeks later on June 21, 2006, complaining of depressive symptoms associated with a chemical dependency.  After she had been discharged on June 10, she used alcohol three times and cocaine on June 20.  She was admitted for treatment with individual group and

---

[13] A GAF of 11 to 20 means the person is in "some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene. . . OR [has] gross impairment in communication (e.g., largely incoherent or mute)."  A GAF between 41 and 50 reflects "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, . . .functioning (e.g., no friends, unable to keep a job)."  On-line DSM-IV.

milieu therapy and medication for depression and erratic sleep.  Her GAF at the time of discharge was 50 and her mood was good, she had a full range of affect, no suicidal or homicidal intentions, and no psychotic symptoms.  Although she was released to an inpatient drug and alcohol rehabilitation program, there are no notes in the record from that treatment.[14]   (Tr. 282-292.)

Between August 15 and December 6, 2006, Ms. Davis participated regularly in group therapy at Mercy Hospital.  On October 19, 2006, she shared information about trying to obtain employment, although she was still feeling anxious, depressed, and unmotivated.  On November 20, 2006, she reported to her treating physician, Koushik Mukherjee, that she had used alcohol the previous week, but was abstaining from all drug use.  She was still dealing with depression and PTSD, but reported she was planning to go to school to become a medical transcriptionist.   Dr. Muhkerjee indicated she had "significant problems with addiction and mood disorder and possibility of a Major Depression with psychotic features vs. Bipolar Disorder, along with symptoms of PTSD." (Tr. 621.)  His diagnoses were cocaine dependence, alcohol dependence, opioid abuse vs. dependence, and major depressive disorder, recurrent, severe, with psychotic features, r/o bipolar disorder NOS, and PTSD.  She seemed to be responding to the current combination of medications, but her

---

[14]  A later note indicates that she left the program uncompleted after about 30 days because of conflict with staff.  (Tr. 259.)

dosages were increased and she was advised to continue group therapy. Her present GAF was 40.[15]   (Tr. 620-622.)

On January 8, 2007, Ms. Davis again returned to the Mercy Hospital inpatient behavioral health unit.   She reported she had begun using drugs and alcohol about a month previously, and was feeling increasingly despondent with dysphoric mood, poor sleep and appetite, feelings of hopelessness and worthlessness.   She had not been attending the Mercy Hospital outpatient rehab program.   The mental status examination on admission indicated she was alert and oriented in time, place and person; had good hygiene and grooming; and her posture was calm and normal.  Her speech was described as slow, relevant, and non-pressured and her thought process was coherent without any psychosis.   She denied suicidal or homicidal thoughts at the time and her concentration, memory and other cognitive functioning appeared intact.   Her affect was described as "fairly constricted."  Her strengths were considered to be the fact that she sought voluntary admission and was in stable health; her weaknesses were chronic drug and alcohol addiction with poor compliance and poor insight.   A report on admission noted that she

---

[15] A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g.,  speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." On-line DSM-IV.

had "a past medical history of crack and alcohol abuse [and] states she has recently relapsed and has been depressed over this." (Tr. 273.) She was discharged on January 15, 2007, with diagnoses of chronic drug and alcohol addiction with frequent relapses and noncompliance with outpatient treatment recommendations. (Tr. 259-281.)

Following her release from the hospital, Ms. Davis returned to outpatient therapy. She explained to her therapist on January 17, 2007, that she believed her previous relapse was the result of not taking her medications consistently and becoming more depressed. (Tr. 532.) She participated regularly in the group therapy sessions and in late February 2007 reported she was having difficulty due to anxiety; she wanted to apply for work but was unsure if she could return job applications. (Tr. 550.) By April her participation in group therapy was irregular and she was out of medications, but had not seen the doctor. She reported on April 23, 2007, that she had a job interview the following day but there is no follow up information on this subject. (Tr. 557.)

On May 7, 2007, Ms. Davis went to the Mercy Hospital emergency room after she began using cocaine and intentionally overdosed on her prescribed medications. She was released two days later and returned to the partial hospital program for follow up. She was irritable, had mood swings, and there were legal charges pending

against her for aggravated assault towards her husband.   In a medical examination on June 14, 2007, her primary diagnoses were cocaine and alcohol dependence along with depressive disorder NOS.   (Tr. 423.) In July, she reported returning to the use of alcohol.

Ms. Davis was readmitted to Mercy Hospital on September 30, 2007, at which time her diagnosis was described as suicidal ideation in the context of relapse on heroin, marijuana and alcohol, together with domestic violence.   She had stopped taking her psychotropic medications "about two months" earlier and was not going to group therapy sessions.   She was placed on medication for withdrawal symptoms of crack cocaine and alcohol.   Her GAF on admission was 30 and 50 at discharge five days later.[16]   (Tr. 227-258.)   She was apparently released to an inpatient rehabilitation program but there are no records from that treatment.

Plaintiff was able to maintain total sobriety from October 2007 until approximately January 1, 2008, when she used alcohol for a single time, but continued to abstain from drug use.   She attended outpatient group therapy, Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA") meetings on a regular basis.   In May 2008, she was hospitalized after a three-day "crack binge" and an intent to commit

---

[16] A GAF between 21 and 30 indicates behavior that is "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." On-line DSM-IV.

suicide by walking into traffic. She was again placed on an acute detox protocol. She reported not having used any medications for four or five days prior to her suicide attempt and was feeling overwhelmed and depressed. Her GAF on admission was 30 and 50 on discharge three days later on May 12, 2008. (Tr. 201-218.)

On July 8, 2008, she returned to Mercy Hospital. She was out of medications and reported she had used crack and alcohol two weeks before. The behavioral health diagnosis indicated she was experiencing mental problems due to substance abuse. Her behavior was described as guarded and suspicious; her mood was sad, dysthymic, dysphonic, anxious, nervous, worried and impatient. She reported getting confused and had experienced auditory hallucinations (i.e., a group of people talking) when she was very exhausted. She expressed adequate insight into her problems; her cognition and intellectual functioning were within normal limits although she was experiencing periods of forgetfulness. The social worker who completed the record noted her history of failing to complete other treatment programs in June and October 2007 and a "long history" of not following through with treatment. Ms. Davis agreed to re-enter a partial hospitalization program for treatment. (Tr. 431-439.)

As part of the Social Security application process, Plaintiff underwent two consultative examinations in July 2008. On July 10, she met with Dr. Steven Pacella for a psychological evaluation. She

identified her present illness as depression characterized by lack

of motivation, withdrawal, fatigue and frequent crying spells.   She

reported that "most recently" she had been admitted to Mercy Hospital

after she "took too many pills."[17]   She did not complain of paranoia

or psychotic events.   She acknowledged she had been poorly compliant

with treatment and stated she experienced little relief through drug

therapy for her symptoms of depression and anxiety.   Dr. Pacella

noted upon examination,

> Ms. Davis was alert and fully oriented, passively
> responsive but able to maintain eye contact, labile in
> emotion and not affectively restricted but not internally
> entertained or autistically preoccupied.   She revealed no
> abnormalities involving station, gait, speech, vision or
> audition, was by no means perceptually disturbed, offered
> a productive, relevant, clear and coherent stream-of-
> thought and displayed no defect of remote recall for most
> personal details. . . .Her history reflects self-
> destructive tendencies and impulse dyscontrol while
> under-the-influence.   I would question the extent to
> which she enjoys genuine insight into her behavior but she
> made no frank attempt to malinger on today's [mental status
> examination.]

(Tr. 319.)   Dr. Pacella further noted Ms. Davis "had absolutely no

problems understanding, retaining and following [his] instructions

and disclosed no defect of attention, concentration or task

persistence."   (Tr. 319.)   She did, however, demonstrate "very

limited tolerance of adult stress, pressure or responsibility."

---

[17]   We note that the medical records show the only reported episode in which
Plaintiff had intentionally overdosed on prescription medications occurred
more than a year earlier and she had two hospital admissions in the
intervening period.

(Id.) Dr. Pacella's mental health diagnoses were substance induced mood disorder and polysubstance dependence, current course unknown. He regarded her prognosis as poor but concluded:

> Pending long term abstinence from substance abuse, there is no clinical basis to make diagnoses of a bipolar, or any other affective, disorder, other than substance-induced. Therefore,. . .assuming she can achieve and maintain sobriety, Ms. Davis should be able to work within a schedule, attend to a task and sustain a consistent, competitive routine for jobs [requiring] little or no formal vocational training.

(Tr. 320.)

On July 31, 2008, Ms. Davis was examined by Dr. Larry Dobkin. He perceived no physical limitations of any type. She reported to Dr. Dobkin that the last time she had used drugs or alcohol had been May 2008, and he commented that her depression, PTSD, and anxiety appeared to be "very disabling for this patient." Although she admitted her past history of drugs and alcohol abuse, "she says she does not use any of this for now." (Tr. 321-330.)

Throughout the remainder of 2008, Ms. Davis continued outpatient therapy and was able to resist using any drugs, but did admit to intermittent alcohol use. The medical records for January and February 2009 are rather sparse, and by March 24, 2009, Ms. Davis indicated she did "not have a clean date" and was not attending AA or NA meetings. (Tr. 508.) Another gap in the record occurs until June 11, 2009, when she was examined by Dr. Dennis Wayne at Mon Yough

Community Services.[18]   He noted in his initial psychiatric evaluation that she had been recently hospitalized at Jefferson Hospital in McKeesport, Pennsylvania, where her anti-depression medications were restarted.[19]   He indicated she had "good insight" into her condition and knew that if she failed to take her medications for as little as a week, she would start experiencing irritability, aggressiveness, homicidal and/or suicidal ideation, and acting out. She reported to Dr. Wayne that she had been clean for eight months. During the interview, Ms. Davis was alert, oriented and cooperative, neatly dressed, with good insight into her condition.  She denied psychotic symptoms and hallucinations, but reported becoming paranoid at times and having symptoms of attention deficit disorder, e.g., getting bored easily and losing interest in things.  Dr. Wayne's diagnostic impressions were bipolar illness, mixed type; PTSD; attention deficit disorder; addiction to crack/cocaine; and cannabis abuse.  Her GAF was 50 during the interview.  Although she was advised to return in two months, there is no evidence of any follow-up treatment.  (Tr. 509-510.)

The final significant medical note in the record dates from December 28, 2009, when Rachael San Pedro, a clinician with the Women's Behavioral HealthCARE program at UPMC Western Psychiatric

[18]   It is unclear from the record why Ms. Davis was being treated at Mon Yough.

[19]   No records pertaining to this hospitalization appear in the transcript.

Institute and Clinic, reported to Mercy Hospital behavioral health services that Ms. Davis was participating in a study of women using psychotropic drugs and other treatments during pregnancy.   Ms. Davis reported depressed mood symptoms with some anxiety, continued problems falling asleep, but more "normal" appetite and energy level. She had voluntarily entered an inpatient program from December 8 to December 18, 2009, for depressed mood and to update her medication regime; she was now being treated for bipolar disorder.[20]   Plaintiff reported her mood had improved since her hospital stay but the symptoms had not fully remitted.   She reported no alcohol or marijuana use since November when she was initially assessed for the UPMC study.   She was continuing to participate in the Mercy Hospital partial hospitalization program.   (Tr. 642-643.)   Although Ms. San Pedro's letter implied there could be further reports from the study, no other correspondence appears in the record.

### E.   The ALJ's Treatment of the Medical Evidence

Judge Koster first addressed the issue of DAA in step three of his analysis.   After finding that none of Plaintiff's alleged severe impairments – bilateral knee osteoarthritis; depressive disorder NOS, substance induced; and polysubstance dependence -- satisfied the criteria for one of the listed impairments, either separately or in combination (Tr. 13-14), the ALJ noted that the

---

[20]   No records from this hospital stay appear in the transcript.

26

"evidence clearly does not define any period of abstinence from
substance abuse.   The most recent medical record dated December 2009
shows that the claimant last reported use of marijuana and alcohol
in November 2009."   (Tr. 14, *citing* Tr. 643.)   He further noted that
despite Ms. Davis's testimony at the hearing that she stopped using
drugs and alcohol in May 2008, the record shows evidence of using
alcohol in August 2008; in November and December 2008, she reported
an unwillingness to stop drinking and was, in fact, actively
drinking; in March 2009, she reported she did not have a "clean date;"
and in November 2009, her primary problem was identified as substance
abuse dependence.   (Tr. 14.)   In short, the ALJ concluded,

> this record does not disclose any meaningful period during
> which the claimant has been free of substance abuse.   The
> records lead to the inference that the claimant's mental
> status would improve and her overall functioning would
> improve if she attained long-term sobriety.

(Tr. 15.)   Relying on the July 12, 2008 report of Dr. Pacella, the
ALJ concluded that substance abuse was a factor material to the
determination of disability.   (Id., *citing* Tr. 314-320.)

Judge Koster returned to this issue later in his analysis.   We
need not recite every point in this portion of his review (Tr. 15-18)
because we find it a thorough and comprehensive summary of all the
evidence in the record and even more detailed than the Court's own
analysis set out in the previous section.   After considering each
of the medical records pertaining to her hospitalizations,

27

outpatient treatment, consultative examinations, etc., and providing a detailed explanation of why he found Ms. Davis's subjective assertions with respect to her mental limitations less than entirely credible (Tr. 15-18), the ALJ concluded that substance abuse was a material factor in determining disability and that "but for the effects of substance addiction, [Ms. Davis] retains the capacity for work that exists in significant numbers in the national economy." (Tr. 20.)

F.   Discussion and Conclusion

We address each of Plaintiff's specific arguments about the ALJ's errors in his materiality analysis.

1.  *The ALJ improperly relied on Dr. Pacella's report:* First, Ms. Davis argues that the ALJ erred by relying extensively on the report submitted by Dr. Pacella who, according to her, was the only medical provider who found that her depression and other mental impairments were substance induced. (*See* Plf.'s Brief at 13, stating that Dr. Pacella "determined that her mood disorder was substance-induced, a finding supported nowhere else in the record.") We believe Plaintiff has overlooked at least two other medical opinions indicating that her mental impairments were substance-induced. As the ALJ pointed out, "In January 2007, it was reported that [Plaintiff] did not appear to have any acute medical issues but was suffering from depression which was likely substance induced."

(Tr. 16.)  The Court has confirmed that on admission to the Mercy Hospital inpatient behavioral health unit on January 8, 2007, the admitting physician, Dr. Gary Pollack, noted:

> The patient is a 42-year-old female with a past medical history of crack and alcohol abuse who states she has recently relapsed and has been depressed over this. . . She appears to have some depression which is *likely substance induced*.

(Tr. 273-274, emphasis added by the Court.)

A similar diagnosis had been made on June 3, 2006, when Ms. Davis was admitted to the same hospital.  Dr. Michael D. Patterson, a consulting physician, wrote that she was "depressed over her drug use and the fact that she was recently [dis]placed from her apartment and is currently staying in a shelter."  She was not taking any medications.  His diagnoses on admission were substance induced mood disorder and polysubstance abuse.  (Tr. 294-295.)

We find unavailing Plaintiff's argument that the ALJ erred by relying on Dr. Pacella's report when the record shows that two other physicians, both concerned with the critical care of patients with mental impairments, had independently noted the likelihood that her depression was substance induced.

2.  *The ALJ failed to address Plaintiff's consistently low GAF scores:*  Plaintiff argues that the ALJ erred by failing to recognize her consistently low GAF scores, even during periods of sobriety.  In fact, Plaintiff states, except

29

for one month or so in 2008, her GAF scores have without
exception been at 50 or below, a fact the ALJ simply ignored
in his rush to judgment.   These extremely low scores
indicate plainly the various evaluators' opinions that Ms.
Davis' mental impairments, standing alone, resulted in
significant limitations.

(Plf.'s Brief at 20-21.)

In particular, Plaintiff points to her GAF scores during two
allegedly sober periods of four and eight months.   Plaintiff does
not precisely identify these periods, but the Court has inferred from
her brief that she is referring first to a period of three months
starting approximately October 19, 2007.   (*See* Plf.'s Brief at 11,
stating that after she returned to the outpatient program at Mercy
Hospital on that date, she remained clean and sober for three months,
but was never able to achieve a GAF score above 48.)   The second
period seems to have started sometime around mid-November 2008 and
continued for eight months.   (*See* Plf.'s Brief at 14, stating that
by February 17, 2009, she had been clean and sober "more than 4 months"
but still had mental health problems including depression and a flat
affect and that in June 2009, when she was evaluated by Dr. Wayne
at Mon Yough Community Services, "she had been clean for 8 months.")

On October 18, 2007, Ms. Davis began a series of outpatient
sessions at Mercy Hospital where she presented "seeking treatment
for AOD [alcohol or drug] dependence."   (Tr. 389.)   From that date
until December 26, 2007, she regularly attended AOD therapy and AA
and NA meetings.   As Plaintiff points out, her GAF scores during that

30

period ranged from 45-48, indicative of severe symptoms. (Tr. 473-486.) When she returned to Mercy Hospital on January 8, 2008, Dr. Nadeem Ahmed noted she had relapsed "about a month ago but only used twice in the last 30 days." She was not taking her prescribed medications nor attending outpatient therapy. Dr. Ahmed's diagnoses were depressive disorder NOS, cocaine dependence, and alcohol abuse (rule out dependence.) A consulting physician noted she was depressed over her recent relapse on crack and alcohol after having been clean "five or six months." Her GAF on admission was 25 or 30, indicative of serious impairment in communication or judgment or an inability to function in society. On release, her diagnoses were chronic drug and alcohol addiction with frequent relapses and noncompliance with outpatient treatment recommendations. (Tr. 259-281.)

As for the second period, the medical evidence shows that Ms. Davis's statements to Dr. Wayne in June 2009 that she had been sober for eight months were not entirely accurate. On four occasions between November 12 and December 12, 2008, Ms. Davis reported to her therapy group that she hoped she could stop drinking, was "unwilling to stop drinking" and accepted she was "not doing well with her addict/alcoholic self," was "ambivalent about quitting drinking," and "has been drinking." There are no reports of GAF scores during this period. (Tr. 588, 592-594.) On February 12, 2009, a note

31

from the Mercy Hospital outpatient clinic indicated that she was seeking treatment for alcohol and cocaine dependence. Her diagnoses were alcohol dependence, cocaine abuse, depressive disorder NOS. On March 24, Ms. Davis told her therapy group that she did not have a clean date. (Tr. 508.) Her GAF both on admission and discharge from the program on June 17, 2009, was 50. (Tr. 393-394.)

The record does, in fact, support Plaintiff's argument that at many times, she was considered to have a GAF score below 50. Not surprisingly, the lowest scores occur when she voluntarily sought inpatient treatment. Many of the other low scores were assigned by persons identified as social workers or other therapists whose qualifications to make such clinical assessments is not known. Where such scores appear in the notes of medical doctors (see, e.g., Tr. 224, 227, 282, 293), other than scores on admission to the hospital, they are at a minimum 50, indicative of serious symptoms. At other times, her GAF score was as high as 60 or 65, indicative of no more than "mild" symptoms or "some difficulty" in social or occupational functioning. (See, e.g., Tr. 390 and 519.)

We recognize that at least one court has concluded that a score of 50 is evidence of an inability to perform substantial gainful activity on a regular and ongoing basis. See Kirk v. Astrue, 723 F. Supp.2d 693, 699 (D. Del. 2010). On the other hand, numerous courts have concluded that a score below 50, e.g., between 45 and

50, does not "require a finding of disability." Gilroy v. Astrue,
No. 08-4908, 2009 U.S. App. LEXIS 24515, *2 (3d Cir. Nov. 9, 2009);
see also Hillman v. Barnhart, No. 02-1416, 2002 U.S. App. LEXIS 21344,
*29, n. 1 (3d Cir. Sept. 26, 2002); Jones v. Astrue, 494 F. Supp.2d
1284, 1288 (N.D. Ala. 2007); and Speagle v. Astrue, CA No. 08-1046,
2010 U.S. Dist. LEXIS 24942, *31-*32 (M.D. Fla. Mar. 4, 2010).   The
SSA has explicitly stated that "[a] GAF score does not have a direct
correlation to the severity requirements of the Social Security
mental disorder listings." Gilroy, id. at *2, citing 66 Fed. Reg.
50764-5 (2000).   "Because the GAF scale does not directly correlate
to the severity requirements in the mental disorders listings, a GAF
score should be considered with all of the evidence but it is not
dispositive." Galvin v. Astrue, CA No. 08-1317, 2009 U.S. Dist.
LEXIS 62930, *6, n.5 (W.D. Pa., July 22, 2009).

The record shows that over the period June 2006 through December
2009, Ms. Davis was treated in emergency rooms and/or admitted for
inpatient treatment at least six times.[21]   The Court's review of the
records pertaining to these admissions does not disclose any
instances in which inpatient treatment was precipitated solely from
increases in depression or anxiety.   Rather, the record indicates
these admissions followed renewed use of drugs and/or alcohol,

---

[21]   Ms. Davis was also treated at Jefferson Hospital in mid-2009, and may
have participated in two other inpatient rehabilitation programs, but
medical records from those events are not in the transcript.

frequently in combination with her failure to take prescribed psychotropic medications as directed.  Compare Salazar v. Barnhart, 468 F.3d 615, 620 and 624 (10th Cir. 2006), where the medical evidence showed that although there was a history of DAA, the plaintiff was hospitalized during at least two periods of sobriety as a result of depression, hopelessness, and suicidal ideation.  Furthermore, during the three-year period covered by the medical records, there appear to have been no frequent changes in the medications Plaintiff was prescribed for depression and anxiety, merely minor adjustment in dosages, from which it could be inferred that this treatment was effective.  The record also indicates that when Ms. Davis was compliant with her medications, she experienced improvement in mood. Compare, for instance, a psychiatric progress note from July 5, 2007, indicating that her sleep and appetite were good and her "depression under control with meds" (Tr. 626) with Dr. Michael Frantz's records from July 18, 2008, i.e., "notes stopping meds.  Increased depression and anxiety. . . mood depressed with congruent affect" or Dr. Wayne's comment of June 11, 2009, "she knows if she is off her medications for a week or less she starts feeling symptoms again." (Tr. 631 and 509.)  None of her medical providers indicated that Ms. Davis's mental impairments, considered in isolation from her substance abuse impairments, were sufficiently limiting as to preclude all forms of substantial gainful activity.  In sum, the

34

evidence indicates that when Ms. Davis was properly medicated and abstained from using drugs or alcohol, her overall condition improved.

Moreover, the ALJ is correct that there is evidence supporting the conclusion that during those periods when Ms. Davis was not using drugs or alcohol, she was capable of working, despite her GAF scores. For example, in February through April 2007, during a period of sobriety, she reported to her therapist on various occasions that she wanted to work but was having trouble preparing applications; she was going to drop off a job application (although she was anxious about the interview); and had an interview with a potential employer. (Tr. 550, 553, 557.)   Her activities of daily living as reported in a questionnaire she prepared in June 2008 and in her examination with Dr. Pacella, as well as her testimony at the hearing, indicate that although she has limitations, she is able to live independently and care for a new-born child.

Plaintiff also argues that the case must be remanded because the ALJ mentioned only a single GAF score from records spanning a period of more than three years.   While conceding that GAF scores, standing alone, cannot be used to determine disability, Plaintiff argues that the ALJ failed to give any reason for discounting evidence that even during periods of sobriety, Plaintiff's GAF remained consistently at 50 or below, a failure she contends is reversible

error.   (Plf.'s Brief at 21-23.)

First, the ALJ is not required to mention every item of evidence, particularly when reviewing an extensive medical history of several hundred pages, as appears here.  *See* Fargnoli v. Halter, 247 F.3d 34, 42 (3d Cir. 2001).   Second, it is clear from the ALJ's thorough analysis of the medical evidence that he closely reviewed Plaintiff's records, since he frequently cited to specific pages of the record in his summary.   We conclude that remand is not necessary to rectify this omission.   *See* Shamonsky v. Comm'r of Soc. Sec., CA No. 10-766, 2011 U.S. Dist. LEXIS 80853, *19 (W.D. Pa. July 25, 2011) (given the ALJ's otherwise thorough discussion of Plaintiff's medical history, including the notes where the GAF scores were provided, the failure to explicitly reference those scores did not constitute error requiring remand.)

3.   *The ALJ's inability to separate effects of DAA from effects of other impairments:*   Plaintiff argues that she should be given the benefit of the doubt and awarded benefits unless the ALJ or the Administration "can prove via the evidence that the claimant's disability disappears when DAA is removed from the picture." (Plf.'s Brief at 20, emphasis in original.)   This argument is a slight misstatement of the law in at least three regards.   First, as discussed above, the consensus among courts in this Circuit is that the burden is on the claimant, not the ALJ, to establish whether

36

DAA is or is not material to the disability determination.   Second, EM-96200 on which Plaintiff relies states that when determining what, if any, impairment-related limitations remain during a drug and/or alcohol free period, "reasonable inferences may be drawn from such information, but they should never extend to the point that presumptions are substituted for documentation."   EM-96200, Answer 31.   This is the same standard applied throughout an ALJ's analysis, not only where DAA is a factor.   *See* Social Security Ruling 86-8, "The Sequential Evaluation Process,"[22] noting that the ALJ may draw reasonable inferences, but "presumptions, speculations, and suppositions should not be substituted for evidence."   Third, the question is not whether the "claimant's disability **disappears** when DAA is removed from the picture."   Rather, the question is the same as in any other disability analysis:   given the severity of the recognized limitations as shown by the medical and other evidence of record, is the claimant capable of performing substantial gainful activity available in the economy?

In her final argument, Plaintiff analogizes this case to that of Ambrosini, *supra*.   In Ambrosini, the court noted that

---

[22]    "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'"   Sykes, 228 F.3d at 271, citing 20 C.F.R. § 402.35(b)(1).   "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same."   Sykes, id., *quoting* Heckler v. Edwards, 465 U.S. 870, 873, n.3 (1984).

> [t]he problem with the ALJ's reasoning is that the
> evidentiary record fails to identify any . . . periods of
> improvement between Ambrosini's alleged periods of
> substance abuse and sobriety. . . . With no medical records
> showing when Ambrosini was or was not sober and no
> consistent self-reports from Ambrosini, there is no
> logical way to determine, as the ALJ did, that Ambrosini
> improves when he is not abusing substances.

(Plf.'s Brief at 24, *quoting* Ambrosini, 727 F. Supp.2d at 431.)

Based on this reasoning, the Ambrosini court concluded the ALJ had

erred by finding the claimant not eligible for benefits.  Plaintiff

argues that the ALJ here made the same error – his reasoning is

deficient because he fails to point to sufficient evidence that

establishes that her condition improves during her periods of

sobriety.  (Plf.'s Brief at 25.)

Even a cursory comparison shows why this case and Ambrosini

should be distinguished.  Unlike that case, here, we have evidence

of two three- to eight-month periods of at least partial sobriety.

A careful review of the evidence from these periods shows that while

Ms. Davis did continue to experience depressive symptoms, her mental

health problems were not severe enough to cause her to return to

inpatient treatment, she was able to take a number of positive steps

to improve her living conditions, e.g., applying for jobs, leaving

an abusive husband, and searching for an apartment.  Although it is

true her mental condition did not significantly improve **immediately**

after she stopped abusing drugs and alcohol, over a period of time,

her GAF scores rose to 60 or 65, indicative of no more than moderate

symptoms or difficulties making social or occupational adjustments.

We recognize that the ALJ did not perform as precisely as he might have the two-part analysis mandated by the Administration when there is evidence of drug or alcohol use as well as another medically-documented impairment.  However, an ALJ need not "use particular language or adhere to a particular format in conducting his analysis."  Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004); see also Rivera v. Comm'r of Soc. Sec., No. 05-1351, 2006 U.S. App. LEXIS 2372, *3 (3d Cir. Jan. 31, 2006) ("The only requirement is that, reading the ALJ's decision as a whole, there must be sufficient development of the record and explanation of findings"); McGill, 2008 U.S. App. LEXIS 16270, at *52-*53 (summarizing the evidence the ALJ considered which showed McGill's mental impairments were severe only when they coincided with DAA and concluding it would not disturb the ALJ's findings because "viewed as a whole, a reasonable mind might accept the record evidence as adequate to support the ALJ's findings that McGill's behavioral and functional problems were attributable to DAA, and that in the absence of DAA, she would not be disabled.") (Internal quotations and citations omitted.)  As the U.S. Court of Appeals for the Seventh Circuit has noted, "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."  Fisher v. Bowen, 869

F.2d 1055, 1057 (7th Cir. 1989); *see also* <u>Rutherford</u>, 399 F.3d at 553 (remand unnecessary when it would not affect the outcome of the case.) We find that substantial evidence supports the ALJ's conclusion that were Ms. Davis able to refrain from the use of drugs or alcohol, she would be able to perform a limited range of light work which accommodated her depression and other mood disorders.

Having concluded none of Plaintiff's arguments provides a reason for this Court to reverse the ALJ's decision denying benefits or to remand for further consideration, Plaintiff's motion for summary judgment is denied and Defendant's motion is granted.

An appropriate Order follows.

November ___15___, 2011          _William L. Standish_
                                    William L. Standish
                                 United States District Judge